IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
08/27/2012

| | |
|---|---|
| IN RE: § | |
| § | CASE NO: 11-39208 |
| THOMAS MARTIN SIMS § | CHAPTER 7 |
| § | |
| Debtor(s). § | JUDGE ISGUR |
| § | |
| § | |
| RICHARD G GUION, *et al* § | |
| § | |
| Plaintiff(s), § | |
| § | |
| vs. § | ADVERSARY NO. 12-3062 |
| § | |
| THOMAS MARTIN SIMS § | |
| § | |
| Defendant(s). § | |

## MEMORANDUM OPINION

Richard Guion and Patricia Fitzpatrick sued Thomas Martin Sims in a Texas state court asserting claims of fraud, breach of fiduciary duty, and breach of contract. The state court rendered death-penalty sanctions against Sims and found him liable for fraud. On October 29, 2011, Sims filed for Chapter 7 bankruptcy. Richard Guion and Patricia Fitzpatrick initiated this adversary proceeding, contending that their state court judgment against Sims is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(6). The Court holds that collateral estoppel applies to this case, and the state court's findings of fraud render the debt nondischargeable under § 523(a)(2)(A). The Court alternatively holds that the debt is excepted from discharge under § 523(a)(2)(A) based on the evidence presented at trial.

### Procedural Background

Richard Guion and Patricia Fitzpatrick (collectively, the "Plaintiffs") filed separate lawsuits against Thomas Martin Sims, both alleging that Sims defrauded the Plaintiffs through a Ponzi

scheme. On December 15, 2006, the Plaintiffs' suits were consolidated. The 280th Judicial District Court of Harris County, Texas rendered death-penalty sanctions[1] against Sims and found Sims liable for fraud.

The state court rendered death-penalty sanctions as a result of Sims's abuse of the discovery process, his failure to comply with Guion and Fitzpatrick's discovery attempts, and his refusal to comply with numerous court orders compelling discovery. *Sims v. Fitzpatrick*, 288 S.W.3d 93, 97 (Tex. App.—Houston [1st Dist.] 2009, no pet.). The state court imposed monetary sanctions on Sims for his misbehavior and prohibited Sims from conducting his own discovery as a sanction for his discovery abuse. *Id.* Sims's pleadings were struck, and the state court entered judgment as to liability in Fitzpatrick's and Guion's favor. *Id.*

Sims filed a demand for a jury trial on damages, but the state court denied the request as untimely. *Id.* The court conducted a bench trial on damages and entered a final judgment awarding Guion $425,000.00 plus interest to Guion and $888,000.00 plus interest to Fitzpatrick. *Id.* at 98.

Sims appealed the case, alleging that the trial court erred in striking his timely jury demand. *Id.* at 96. The appellate court held that the jury demand was timely filed and reversed the judgment of the trial court for a new trial on the issue of damages. *Id.* at 107. However, the appellate court affirmed the judgment of the trial court in all other respects, including the trial court's imposition of death penalty sanctions against Sims as to liability. *Id.* Before the trial court could hold a new trial on the issue of damages, all parties entered into a settlement agreement. Pursuant to the settlement,

---

[1] Death penalty sanctions are

> a court's order dismissing the suit or entering a default judgment in favor of the plaintiff because of extreme discovery abuses by a party or because of a party's action or inaction that shows an unwillingness to participate in the case. Such a sanction is rarely ordered, and is usually preceded by orders of lesser sanctions that have not been complied with or that have not remedied the problem.

*Black's Law Dictionary* 1459 (9th ed. 2009).

Sims was to make monthly payments to Guion and Fitzpatrick until Guion received $443,692.49 and Fitzpatrick received $988,878.00.

Shortly after the settlement, Sims filed for chapter 7 bankruptcy on October 29, 2011.

On January 25, 2012, Fitzpatrick and Guion filed a complaint seeking to except the state court judgment from discharge under § 523(a)(2)(A) and (a)(6). On July 6, 2012, twelve days before trial, Sims filed a motion in limine to restrict the Plaintiffs' evidence and testimony at trial. Sims asked the Court to prohibit the Plaintiffs from "presenting any documents or witnesses as none were disclosed in answer to [his] discovery requests."[2] The Court concluded that the Plaintiffs had not engaged in any discovery abuse. The discovery had been *sent* to Sims. His position was that he had not *received* what had been sent. Because Sims alleged that he had not received the information, he asked that the Plaintiffs be precluded from presenting the evidence to the Court. Although the Court found no fault by the Plaintiffs, the Court offered Sims the opportunity for continuance so that he could be better prepared. However, Sims decided to proceed with the trial.

During the trial, Sims both testified and made an oral statement to the Court. Ray Campbell, Sims's business partner at TMS Financial Services ("TMS"), and Richard Guion also testified. Throughout the trial held on July 18, 2012, Sims objected to the introduction of evidence on similar grounds to those in his motion in limine, asserting that he was not prepared for trial due to insufficient time to review the evidence. However, all of these objections were made after Sims declined a continuance and requested that the trial proceed.

## Analysis

The elements of collateral estoppel under Texas law have been met, and this Court gives preclusive effect to the state court's finding of Sims's liability for fraud. Sims's debt to Guion and

---

[2] Dkt. # 18.

Fitzpatrick is excepted from discharge pursuant to § 523(a)(2)(A). Therefore, the Court does not decide whether or not the debt is excepted from discharge under § 523(a)(6).

I.     **Collateral Estoppel**

Collateral estoppel is applicable in bankruptcy dischargeability proceedings. *Grogan v. Garner*, 498 U.S. 279, 284 (1991). When the bankruptcy court is dealing with the effect of a state court judgment, the applicable rules of preclusion are those from the state in which the judgment was rendered. *Plunk v. Yaquinto (In re Plunk)*, 481 F.3d 302, 307 (5th Cir. 2007). Here, a Texas court found Sims liable for fraud, so the collateral estoppel law of Texas applies. Texas has defined collateral estoppel as:

> [More] narrow than res judicata in that it only precludes the re-litigation of identical issues of facts or law that were actually litigated and essential to the judgment in a prior suit. Once an actually litigated and essential issue is determined, that issue is conclusive in a subsequent action between the same parties.

*Van Dyke v. Boswell, O'Toole, David & Pickering*, 679 S.W. 2d 381, 384 (Tex. 1985).

Under Texas law, collateral estoppel applies when the following elements are met: (1) the facts sought to be litigated in the second action were fully and fairly litigated in the prior action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action. *Schwager v. Fallas (In re Schwager)*, 121 F.3d 177, 181 (5th Cir. 1997).

The Court is not collaterally estopped as to the amount of the debt, because that issue was not fully litigated. Nevertheless, Sims is bound by the amount specified in the settlement agreement. To determine the dischargeability of the debt, the Court looks not at the settlement but at the underlying facts giving rise to the debt. *Archer v. Warner*, 538 U.S. 314, 321 (2003) ("A debt embodied in the settlement of a fraud case 'arises' no less 'out of' the underlying fraud than a debt embodied in a stipulation and consent decree."). Because the underlying facts giving rise to the debt were litigated in the state court, the Court is bound by the state court's findings of fraud.

With respect to the fraud findings, the second and third elements of the collateral estoppel doctrine are met. The second element is met because the elements of a § 523(a)(2)(A) claim are virtually identical to the elements of a Texas state-law fraud claim. *Park v. Chang (In re Park)*, 271 Fed.Appx. 398, 400 (5th Cir. 2008); *Johnson v. Tex. Venture Partners (In re Johnson)*, 9 F.3d 1547, 3 (5th Cir. 1993); *see generally J.M. Muniz, Inc. v. Mercantile Tex. Credit Corp.*, 833 F.2d 541, 544 (5th Cir. 1987) (explaining that the facts in the first action had not changed from the facts in the second action). The facts supporting the § 523(a)(2)(A) claim were therefore essential to the state court's finding. Additionally, the third element of the Texas collateral estoppel rule is satisfied because the parties in this adversary proceeding—Sims, Guion, and Fitzpatrick—were the same parties in the state court case. *See McCoy v. Hernandez,* 203 F.3d 371, 374 (5th Cir. 2000).

A.  **Death-Penalty Sanctions Satisfy the "Fully and Fairly Litigated" Prong of Collateral Estoppel**

The "fully and fairly litigated" prong of the collateral estoppel rule requires more analysis. The state court's determination of Sims's fraud resulted from the court's imposition of death-penalty sanctions in favor of Guion and Fitzpatrick. A death-penalty sanction has the effect of adjudicating the dispute. *O'Connor's Texas Rules: Civil Trials* 271 (2003 ed.); *see Gober v. Terra + Corp. (In re Gober)*, 100 F.3d 1195, 1201 (5th Cir. 1996) (holding that an issue had been fully and fairly litigated when pleadings were struck for discovery abuse).

The Fifth Circuit holds that the "fully and fairly litigated" element of the collateral estoppel doctrine is satisfied with various kinds of default judgments. *Cornwell v. Loesch (In re Cornwell)*, 109 F. App'x 682, 684 (5th Cir. 2004). A sanctioned post-answer default judgment is considered a final judgment on the merits for collateral estoppel purposes even when the defendant's pleadings are struck. *See Gober*, 100 F.3d at 1201 (explaining that the judgment was final because debtor was aware of the creditor's motion for sanctions and of the possibility that the court would strike his pleadings in rendering a default judgment). In *Gober*, the Fifth Circuit supported its holding by

emphasizing that the "state court struck Gober's pleadings only after Gober had repeatedly impeded the course of the proceedings by refusing to comply with discovery and by defying court orders." *Id.* at 1205-06.

The Plaintiffs' fraud claims against Sims were fully and fairly litigated. Prior to the entry of the default judgment, Sims had resisted Guion and Fitzpatrick's multiple discovery attempts and even refused to comply with several court orders compelling discovery. *Sims*, 288 S.W.3d at 97. The state court imposed monetary sanctions on Sims and ultimately prohibited Sims from conducting his own discovery as a sanction for discovery abuse. As a last resort, the court imposed death-penalty sanctions on Sims and struck his pleadings for his continued abuse of the discovery process.

Although Sims did not substantively litigate the fraud issue in state court, the "fully and fairly litigated" prong of the collateral estoppel rule is satisfied due to Sims's egregious conduct during the discovery process. "Even if [an issue] was not litigated, the party's reason for not litigating in the prior action may be such that preclusion would be appropriate." *Gober*, 100 F.3d at 1206. Sims deliberately chose not to move forward with the state court action and frustrated the case by abusing the discovery process. The "fully and fairly litigated" prong of the collateral estoppel doctrine is satisfied.

    **B.    The State Court Judgment is Final Despite the Court of Appeals' Remand on the Issue of Damages.**

The doctrine of collateral estoppel applies only to final judgments. *Dauterman v. Goodman Grp., Inc. (In re Dauterman)*, 1993 WL 13569372 (5th Cir. 1993). The Fifth Circuit has established that, for purposes of collateral estoppel, a judgment may be final even though an appeal is pending or a lower court has yet to fully dispose of the matter from which the issue arises. *Prager v. El Paso Nat. Bank,* 417 F.2d 1111, 1112 (5th Cir. 1969); *Scurlock Oil Co. v. Smithwick*, 724 S.W.2d 1, 6 (Tex. 1986). Under the Fifth Circuit's flexible final judgment standard, a final judgment does not have to dispose of all matters involved in the proceeding. *Pye v. Dep't of Transp. of Georgia*, 513

F.2d 290, 292 (5th Cir. 1975). For example, in *Pye*, the appellate court affirmed the lower court's merits decision but remanded the case on the issue of damages. *Id.* The Fifth Circuit held that the lower court's continuing jurisdiction on the issue of damages did not deprive the judgment on the merits of finality for the purposes of issue preclusion. *Id.*

The state court judgment finding Sims liable for fraud is a final judgment for purposes of collateral estoppel even though the court of appeals remanded the case on the issue of damages. At the appellate level, the case was affirmed in all respects except on the issue of damages. The death-penalty sanctions adjudicated the dispute, and the appellate court affirmed Sims's liability for fraud. The state court's continuing jurisdiction over the case on the issue of damages did not include the authority to change the substantive judgment and appellate affirmation of Sims's liability for fraud. The state court's judgment ended the litigation with respect to the fraud that created the dischargeability issue before this Court.

The imposition of death-penalty sanctions satisfies the fully and fairly litigated prong of collateral estoppel, and the facts litigated in the state court fraud action were the same facts presented before this Court.

A finding of fraud by a Texas state court satisfies the elements of § 523(a)(2)(A). *Park v. Chang (In re Park)*, 271 Fed. App'x 398, 400 (5th Cir. 2008). The elements of fraud in Texas are: (i) defendant made a representation to plaintiff; (ii) the representation was material; (iii) the representation was false; (iv) when the representation was made, defendant knew it was false or made the representation recklessly and without knowledge of its truth; (v) the defendant made the representation with the intent that the plaintiff act on it; (vi) the plaintiff relied on the representation; and (vii) the representation caused the plaintiff injury. *Shandong Yinguang Chem. Indus. Joint Stock Co., v. Potter*, 607 F.3d 1029, 1032 (5th Cir. 2010). These state court elements parallel the requirements of a § 523(a)(2)(A) claim: (i) a representation made by debtor; (ii) that is false; (iii)

made with the intent to deceive the creditor; (iv) the creditor actually and justifiably relief on the representation; and (v) the creditor sustained an injury as a proximate result of its reliance. *General Electric v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir. 2005).

The finding of fraud was fully and fairly litigated and essential to the state court's judgment. Sims and the Plaintiffs were adversaries in both this Court and the state court. The state court's findings render the debt nondischargeable under § 523(a)(2)(A) because all three elements of the collateral estoppel doctrine have been met.

## II. Discargeability Pursuant to 11 U.S.C. § 523(a)(2)(A)

Although this Court recognizes the state court judgment's preclusive effect, the Court alternatively finds that the Plaintiffs presented evidence establishing each element of fraud under § 523(a)(2)(A).

### A. Fifth Circuit Standard

Section 523(a)(2)(A) provides that a debt is nondischargeable if it is "for money, property, services, or an extension, renewal, or refinancing of credit," to the extent that it was "obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A).

For a debt to be nondischargeable under § 523(a)(2)(A), the creditor must show that (i) the debtor made a representation; (ii) the debtor knew the representation was false; (iii) the representation was made with the intent to deceive the creditor; (iv) the creditor actually and justifiably relied on the representation; and (v) the creditor sustained an injury as a proximate result of its reliance. *Acosta,* 406 F.3d at 372 (citing *AT&T Universal Card Servs. v. Mercer* (*In re Mercer)*, 246 F.3d 391, 403 (5th Cir. 2001)).

### B. Findings of Fact

The Court finds that Richard Guion's testimony was credible. Based on his testimony, the Court makes the following factual determinations:

- When the Plaintiffs loaned TMS money, their loans were made in exchange for the promise of monthly "royalty payments" (the monthly royalty payments were, for all intents and purposes, payments of interest) and the eventual repayment of their loans.

- Sims represented himself as a "professional trader" in commodities. The Plaintiffs' loans to TMS were based on the false representation that their loaned money would be used to trade commodities. Sims falsely represented that he would invest the proceeds of the loans in commodities such as oil, treasuries, and gold.

- The Plaintiffs were unaware that TMS's would only invest a nominal amount of the loan proceeds in commodities and would spent the rest.

- The Plaintiffs were also unaware that TMS was using the loaned money to risk approximately $810,000 on a movie titled *Miss Castaways*. The movie was a financial failure; the Court is unaware of its artistic merit.

- Had the Plaintiffs been aware of TMS's actual investment scheme, they would not have loaned money to TMS.

- Sims falsely represented that his own money, and the money of Daylee Snell, Guion's cousin and Fitzpatrick's childhood friend, was invested in the company. These representations were important in the Plaintiffs' decisions to make subsequent investments in TMS. Sims failed to disclose that Daylee Snell was compensated for her efforts in obtaining the Plaintiffs' loans.

- Guion's repeated investment was also based on discussions with Sims in which Sims represented that TMS was making money, and never disclosed that TMS's investments had lost money.

### C. Sims made representations, which he knew were false, with intent to deceive the Plaintiffs

Regarding the intent requirement under § 523(a)(2)(A), the Fifth Circuit has reiterated that "[a] creditor must probe the debtor's intent to deceive in order to obtain a non-dischargeability judgment." *Friendly Fin. Serv. – Eastgate v. Dorsey (In re Dorsey)*, 505 F.3d 395, 399 (5th Cir. 2007). Intent to deceive "may be inferred from reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation." *Acosta*, 406 F.3d at 372 (citing *Norris v. First Nat'l Bank of Luling* (*In re Norris*), 70 F.3d 27, 30 n.12 (5th Cir. 1995) (internal quotation marks omitted)).

The Court finds that Sims knew his representations—the promise of royalty payments and the eventual repayment of the Plaintiffs' loans—were false. It was not possible for TMS to repay the

Plaintiffs' loans with revenues generated by investing only a nominal amount of their loans in commodities.[3]

The loans to Sims totaled $2,000,000.00. Sims only invested about $100,000.00 of the $2,000,000.00, resulting in negative leverage. For the purposes of illustration, using modest estimates for interest rates (3.25%), leverage ratio (2/1) and overhead expenses ($80,000.00), the following analysis shows that TMS's investment scheme was not remotely capable of generating the revenues being disbursed as royalty payments. The table presents three scenarios. Sims invests only the $100,000.00; Sims invests all $2,000,000.00; Sims leverages the $2,000,000.00 with an additional $2,000,000.00 of borrowed funds:

| Amount Invested | Interest Payable on Borrowed Funds at Prime Plus 2% (5.25%) | Overhead Expenses (e.g.) | Amount Required to Pay 24% on $2,000,000 after Leverage Expenses | Necessary Yield on Invested Funds |
|---|---|---|---|---|
| $100,000.00 | n/a | $80,000.00 | $560,000.00 | 560.00% |
| $2,000,000.00 | n/a | $80,000.00 | $560,000.00 | 28.00% |
| $4,000,000.00 | $105,000.00 | $80,000.00 | $665,000.00 | 16.63% |

Sims testified that the Plaintiffs knew trading commodities was a "risky business," and that is why TMS paid out 24% interest. In seeking to make such excessive returns, TMS *deleveraged* the Plaintiffs' loans by only investing approximately $100,000.00 of the $2,000,000.00 in the commodities market. In order for the $2,000,000.00 loaned to TMS to yield 2% royalties per month (i.e., 24% per annum) and cover TMS's overhead, TMS needed to make a 560% return on the $100,000.00 actually being invested in commodities. *See* Figure 2, *supra*.

---

[3] From Sims's testimony, the Court learned that TMS's goal was to make $1,000.00 per business day trading commodities. Even if TMS hit that goal, it would have had gross revenues of about $20,000.00 per month. This amount is far short of the $40,000.00 per month of net income from operations required to make royalty payments.

Even if TMS had invested the entire loaned amount, $2,000,000.00, a 28% return would be necessary to cover the royalties and overhead expenses. TMS never made profits consistent with such an excessive yield.

Sims, a "professional trader" of commodities, knew what returns would have been required to generate a sufficient return to pay the Plaintiffs. He knew that the returns were impossible to achieve. The only way to pay the required returns to the investors was to engage in a Ponzi scheme so that funds from later investors would be used to pay returns to earlier ones.

The Court finds that Sims's representations were made with intent to deceive the Plaintiffs. Sims demonstrated more than a mere "reckless disregard for the truth." He obtained the loans under the knowingly false claim that TMS was "making money," when in reality the loans were necessary to keep up with royalty payments. *See Acosta*, 406 F.3d at 372.

Sims falsely represented the nature of TMS's investment scheme with intent to deceive the Plaintiffs, in order to obtain loans by false pretenses, false representation, or actual fraud.

### D. Plaintiffs actually and justifiably relied on the representations and sustained injuries as a result

Reliance on a false pretense or false representation under § 523(a)(2)(A) must only be "justifiable." *Field v. Mans*, 516 U.S. 59, 74–75 (1995). The justifiable reliance standard imposes no duty to investigate on the Plaintiffs unless the falsity of the representation is readily apparent. *See id.* at 70–72. Whether a party justifiably relies on a misrepresentation is determined by looking at the circumstances of a particular case and the characteristics of a particular plaintiff, not by an objective standard. *Id.* at 71.

The Court finds that Plaintiffs actually relied on the representations made by Sims. Credible witness testimony evinces that had Plaintiffs known the true nature of TMS's investments, they would not have loaned money to TMS.

The Court also finds that Plaintiffs' reliance was justifiable. The Plaintiffs were justified in assuming that Sims's representations that TMS was making money by investing in commodities were true. *See Field v. Mans*, 516 U.S. 59, 74-75 (1995) (noting that "a person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'") (quoting *Restatement (Second) of Torts* (1976) §540)). The Plaintiffs were also justified in trusting their confidant, Daylee Snell, a paid agent of TMS, due to established relationships with Ms. Snell. Furthermore, because of their reliance on Sims's false representations, Plaintiffs suffered the loss of the amount of their loans to TMS.

The elements of § 523(a)(2)(A) are satisfied. Sims made false representations for the purposes of obtaining loans, and the representations were intended to deceive the Plaintiffs. Additionally, the Plaintiffs actually and justifiably relied on Sims's false representations and sustained injuries as a result. Thus, the Court alternatively concludes, on the basis of the evidence presented at trial, that Sims's debts to the Plaintiffs are excepted from discharge.

## Conclusion

Sims's debts to the Plaintiffs are excepted from discharge. Sims is liable to Plaintiffs in the amounts already determined in the state court action.

SIGNED **August 27, 2012.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE